UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | | |
|---|---|---|
| SUPREME AUTO TRANSPORT LLC, | ) | |
| a Michigan Corporation, | ) | |
| on behalf of themselves and all | ) | **No. 07-CV-6703 (PAC)** |
| others similarly situated, | ) | **ECF CASE** |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| | ) | |
| CERTAIN UNDERWRITERS OF LLOYD'S | ) | |
| OF LONDON, SYNDICATE MEMBERS: | ) | |
| 0033, 0102, 0382, 0435, 0510, 0570, 0609, | ) | |
| 0623, 0727, 0958, 1003, 1084, 1096, 1183, | ) | |
| 1245, 1886, 2001, 2003, 2010, 2020, 2488, | ) | |
| 2623, 2791 and 2987 FOR THE | ) | |
| UNDERWRITING YEARS AT ISSUE; | ) | |
| MARSH AND MCLENNAN COMPANIES | ) | |
| INC.; MARSH PRIVATE CLIENT | ) | |
| SERVICES; MARSH LIMITED; AON | ) | |
| CORPORATION; AON LIMITED; WILLIS | ) | |
| GROUP HOLDINGS LIMITED; | ) | |
| WILLIS LIMITED; and JOHN DOES 1-100, | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

Plaintiff Supreme Auto Transport LLC, a Michigan Corporation, by and through

its attorneys, brings this civil action for damages and injunctive relief on behalf of itself

and all others similarly situated against the above named Defendants, and demanding a

trial by jury, complains and alleges as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to 15 U.S.C. §§ 15 and 26, and pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367. This Court has personal jurisdiction over each of the Defendants because each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in this Judicial District and throughout the United States.  For the state law claims, the Court also has jurisdiction pursuant to 28 USC §1332(d), in that this is a class action in which the matter of controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and which some members of the proposed class are citizens of a different state than the Defendants.

2.      Venue is proper in this Judicial District pursuant to 15 U.S.C. §§ 22 and 28 U.S.C. §§ 1391(b) and (c) because some of the Defendants reside, or are licensed to do business or are doing business, or are found or transact business in this District and/or the claims arose in this District.

## DEFINITIONS

3.      Commercial Insurance Policy ("Insurance") means an insurance policy sold to a business for liability, property, casualty, and various other insurance types during the Class Period.

4.      As used herein, the term "Class Period" means the time period January 1, 1998 through July 16, 2007.

5.      The "Indirect Purchaser States" are Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nevada,

New Jersey, New Mexico, New York, North Carolina General, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

6.    The "Consumer Fraud States" are Alaska, Arkansas, California, District of Columbia, Florida, Idaho, Maine, Montana, Nebraska, Nevada, New York, New Hampshire, New Mexico, North Carolina, Utah, Vermont, West Virginia.

### THE PARTIES

**A.    Plaintiff**

7.    Plaintiff Supreme Auto Transport LLC ("Plaintiff"), a Michigan Corporation with its principal place of business in Oakland County, is an auto transport company which uses semi trucks with auto hauling trailers.  Plaintiff purchased several insurance policies from one or more of the Defendants during the Class Period for end use and not for resale.   Plaintiff was injured as a result of Defendants' illegal conduct.

**B.    Defendants**

8.    Defendant Lloyd's Syndicate 0033 is managed by Hiscox Syndicates Limited, a specialist insurer who underwrites a particular range of personal and commercial risks, who is located at 1 Great St Helen's, London, EC3A 6HX, United Kingdom.  During the Class Period, Defendant underwrote and distributed commercial insurance policies to customers throughout the United States.

9.    Defendant Lloyd's Syndicate 0102 was managed by Goshawk Syndicate Management Ltd on October 30, 2003. "Goshawk Syndicate Management Ltd will no longer be able to accept any new risks on behalf of syndicate 102" according to http://www.lloyds.com/News_Centre/Press_releases/Lloyds_statement_on_Goshawk_Sy

ndicate.htm.    During the Class Period, Defendant Lloyd's Syndicate 0102 underwrote commercial insurance policies to customers throughout the United States.

10.    Defendant Lloyd's Syndicate 0102 is managed by Hardy Underwriting Group which is a business entity organized under the laws of United Kingdom.  Hardy Underwriting Group has a principal place of business at 4th Floor, 40 Lime Street, London,  EC3M 7AW, United Kingdom.  During the Class Period, Defendant Lloyd's Syndicate 0102 underwrote commercial insurance policies to customers throughout the United States.

11.    Defendant Lloyd's Syndicate 0382 is managed by Hardy Underwriting Group which is a business entity organized under the laws of United Kingdom.  Hardy Underwriting Group has a principal place of business at 4th Floor, 40 Lime Street, London,  EC3M 7AW, United Kingdom.  During the Class Period, Defendant Lloyd's Syndicate 0382 underwrote commercial insurance policies to customers throughout the United States.

12.    Defendant Lloyd's Syndicate 0435 is managed by Faraday Underwriting Limited which is a business entity organized under the laws of United Kingdom and is located at 5th Floor, Corn Exchange, 55 Mark Lane, London, EC3R 7NE, United Kingdom.  During the Class Period, Defendant Lloyd's Syndicate 0435 underwrote commercial insurance policies to customers throughout the United States.

13.    Defendant Lloyd's Syndicate 0510 is managed by R.J. Kiln and Company Ltd. which is a business entity organized under the laws of United Kingdom and is located at 106 Fenchurch Street, London, United Kingdom, EC3M 5NR.  During the

Class Period, Defendant Lloyd's Syndicate 0510 underwrote commercial insurance policies to customers throughout the United States.

14.     Defendant Lloyd's Syndicate 0570 is managed by Atrium Underwriters Limited who specialize in non marine syndicates in Lloyd's Market. Atrium Underwriters Limited is organized under the laws of the United Kingdom and is located at Room 790, Lloyd's, 1 Lime Street, London, EC3M 7DQ, United Kingdom.  Defendant Lloyd's Syndicate 0570 underwrites commercial insurance policies to customers throughout the United States.

15.     Defendant Lloyd's Syndicate 0609 managed by Atrium Underwriters Limited who specialize in non marine syndicates in Lloyd's Market. Atrium Underwriters Limited is organized under the laws of the United Kingdom and is located at Room 790, Lloyd's, 1 Lime Street, London, EC3M 7DQ, United Kingdom.  Defendant Lloyd's Syndicate 0609 underwrites commercial insurance policies to customers throughout the United States.

16.     Defendant Lloyd's Syndicate 0623 and 2623 are managed by Beazley Group PLC located at Plantation Place South, 60 Great Tower Street, London, EC3R 5AD, United Kingdom. Beazley USA's corporate offices are located at 30 Batterson Park Road, Farmington, Connecticut, 06032. Defendant Lloyd's Syndicate 0623 and 2623 underwrote surplus policy lines for Lloyd's of London for customers throughout the United States.

17.     Defendant Lloyd's Syndicate 0727 is managed by S.A. Meacock & Company Limited. S.A. Meacock & Company Limited is a business entity organized under the laws of United Kingdom and is located at 4th Floor, 15 St Helen's Place,

London, EC3A 6DE, United Kingdom.  During the class period, Defendant Lloyd's Syndicate 0727 underwrote commercial insurance policies to customers throughout the United States.

18.     Defendant Lloyd's Syndicate 0958 is managed by Omega Underwriting Holdings. Omega Underwriting Holdings is a business entity organized under the laws of Bermuda. Its U.S. subsidiary Omega US Insurance Inc. is located at 3525 Piedmont Road, 7 Piedmont Center, Suite 300, Atlanta, Georgia 30305. During the Class Period, Defendant Lloyd's Syndicate 0958 underwrote commercial insurance policies to customers throughout the United States.

19.     Defendant Lloyd's Syndicate 1003 and successor syndicate 2003 are managed by Catlin Group Limited. Catlin Group Limited is a business entity organized under the laws of United Kingdom.  It is located at 3 Minster Court Mincing Lane, London, EC3R 7DD, United Kingdom. Catlin, U.S. has an office located at 140 Broadway, 43rd Floor, New York, NY 10005. During the Class Period, Defendant Lloyd's Syndicate 1003 and 2003 underwrote commercial insurance policies to customers throughout the United States.

20.     Defendant Lloyd's Syndicate 1084 and Syndicate 1096 are managed by Chaucer Syndicates Ltd. The two syndicates 0587 and 1096 merged in 2003 to form syndicate 1084.  Chaucer Syndicates Ltd is a business entity organized under the laws of United Kingdom who is located at 9 Devonshire Square, EC2M 4WL, London, United Kingdom. During the Class Period, Defendant Lloyd's Syndicate 1084 and 1096 underwrote commercial insurance policies to customers throughout the United States.

21.    Defendant Lloyd's Syndicate 1183 is managed by Talbot Underwriting LTD. who is located at Grace Church House, London, EC3V OJP, United Kingdom. During the Class Period, Defendant Lloyd's Syndicate 1183 underwrote commercial insurance policies to customers throughout the United States.

22.    Defendant Lloyd's Syndicate 1245 is managed by Heritage Managing Agency Limited who is located at 47 Mark Lane, London, EC3R 7QQ and who is registered in the United Kingdom, Reg. No. 3741768. During the Class Period, Defendant Lloyd's Syndicate 1245 underwrote commercial insurance policies to customers throughout the United States.

23.    Defendant Lloyd's Syndicate 1886 is managed by Limit Underwriting LTD. and is owned as a wholly owned subsidiary of QBE Insurance Group organized under the laws of Australia.  QBE Insurance Group is located at Level 2, 82 Pitt Street, Sydney, NSW 2000, Australia.  During the Class Period, Defendant Lloyd's Syndicate 1886 underwrote commercial insurance policies to customers throughout the United States.

24.    Defendant Lloyd's Syndicate 2001 is managed by Amlin Underwriting Limited which is a business entity organized under the laws of United Kingdom.  Amlin Underwriting Limited is located at St. Helen's, One Undershaft, London, EC3A 8ND United Kingdom.   During the Class Period, Defendant Lloyd's Syndicate 2001 underwrote commercial insurance policies to customers throughout the United States.

25.    Defendant Lloyd's Syndicate 2010 is managed by Cathedral Underwriting Limited which is a business entity organized under the laws of United Kingdom. Cathedral Underwriting is located at 5th Floor, Fitzwilliam House, 10 St Mary Axe,

London, EC3A 8EN, United Kingdom.  During the Class Period, Defendant Lloyd's Syndicate 2010 underwrote commercial insurance policies to customers throughout the United States.

26.    Defendant Lloyd's Syndicate 2020 was managed by Wellington Underwriting PLC, and then later management changed to Catlin Group Limited which is a business entity organized under the laws of United Kingdom.  Catlin Group Limited is located at 3 Minster Court, Mincing Lane, London, EC3R 7DD, United Kingdom. Catlin, US has an office located at 140 Broadway, 43rd Floor, New York, NY 10005. During the Class Period, Defendant Lloyd's Syndicate 2020 underwrote commercial insurance policies to customers throughout the United States.

27.    Defendant Lloyd's Syndicate 2488 is managed by ACE Underwriting Agency Limited who is located at 100 Leadenhall St, London, EC23A 3BP, United Kingdom. During the Class Period, Defendant Lloyd's Syndicate 2488 underwrote commercial insurance policies to customers throughout the United States.

28.    Defendant Lloyd's Syndicate 2791 is managed by Managing Agency Partners LTD. who is located at 1st Floor, 110 Fenchurch Street, London, EC3M 5JT. During the Class Period, Defendant Lloyd's Syndicate 2791 underwrote commercial insurance policies to customers throughout the United States.

29.    Defendant Lloyd's Syndicate 2987 is managed by Brit Syndicates Limited who is located at 55 Bishops Gate, London, United Kingdom, EC2N 3AS. During the Class Period, Defendant Lloyd's Syndicate 2987 underwrote commercial insurance policies to customers throughout the United States.

30.     Every Defendant in Lloyd's Syndicate is a resident of United Kingdom, a foreign agent for Lloyd's, and eligible to write various surplus insurance and reinsurance in the United States.

31.     Broker Defendant Marsh and McLennan ("MMC") is a Delaware Corporation whose shares are listed on the New York Stock Exchange and has their Corporate Headquarters in New York. "The companies of MMC are among the world's leading global advice and solutions providers in risk, strategy and human capital. Through our expertise and commitment to excellence, we are dedicated to managing risk, maximizing growth, and creating value for clients and share- holders."  See company website www.MMC.com.

32.     Defendant Marsh Private Client Services is a subsidiary of MMC, located in England, who sells and distributes insurance and reinsurance policies to clients in the United States.

33.     Defendant Marsh Limited is a subsidiary of MMC, located in England, who sells and distributes insurance and reinsurance policies to clients in the United States.

34.     Defendant AON Corp. a Delaware Corporation whose headquarters is located in Chicago, Illinois. AON is a global company and is the parent of many subsidiaries that provides clients with insurance brokerage services and underwriting.

35.     Defendant AON UK is a subsidiary of AON Corp., located in England, who sells and distributes insurance and reinsurance policies to clients in the United States.

36.     Defendant Willis Group Limited is incorporated under the laws of Bermuda and is headquartered in London, England. Willis Group is a publicly traded company traded on the New York Stock Exchange. Willis Group is a global company and is the parent of many subsidiaries that provides clients with insurance brokerage services and underwriting.

37.     Defendant Willis Group Holdings Limited is a subsidiary of Willis Group Limited and headquartered in London, England.

<u>CO-CONSPIRATORS</u>

38.     Defendant John Does 1-100 are presently not ascertainable by Plaintiffs and are in the exclusive knowledge of the Defendants.  The Complaint in this action will be amended when their true identities are known.

39.     The acts alleged in this Complaint have been completed by Defendants and their co-conspirators, or were authorized, ordered or completed by their respective officers, employees or representatives while actively engaged in the management of Defendant's companies.

40.     Each of the Defendants named herein acted as an agent or trustee with respect to the acts, violations and common course of conduct alleged herein.

41.     Defendants conduct business throughout the United States including the State of New York and they have purposely availed themselves of the laws of the Indirect Purchaser States and Consumer Fraud States as defined herein.

<u>INSURANCE POLICIES OF PLAINTIFF</u>

42.     Plaintiff Supreme Auto Transport LLC purchased an insurance policy through an agent that deals with the Defendants.  The insurance policy has an effective

date within the Class Period for coverage for collision and property liability in the amount of $350,000.   The policy was brokered through Sunforest Transportation Insurance Group, Inc., and sold through and underwritten by Lloyd's Syndicates 2001 and 2010.

## RELEVANT PRODUCT AND GEOGRAPHIC MARKET

43.    To the extent necessary, the relevant product market is the market for Commercial Insurance policies in the United States that were sold to businesses in response to their particular risk needs. The relevant geographic market is the entire United States, and/or the Indirect Purchaser States and/or Consumer Fraud States (as defined below).  At all relevant times, including the present, all Defendants' collectively held the vast majority of the market share in the relevant product and geographic markets.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action on behalf of himself, and on behalf of all others similarly situated.  Plaintiff seeks to represent the following class, defined as:

> All persons and entities residing in the United States who, from January 1, 1998 to the present, purchased or renewed a contract of insurance with one of the Defendants in the United States for their own use and not for resale.  Excluded from the Class are: governmental entities, any judge, justice or judicial officer presiding over this matter and the members of his or her immediate family, Defendants and their co-conspirators, along with their respective parents, subsidiaries and/or affiliates.  Also excluded from this Class are the legal representatives, heirs, successors and attorneys for any excluded person or entity, and any person acting on behalf of any excluded person or entity.

45.    All Class members are hereinafter referred to as the "Class", subject to additional information obtained through further investigation and discovery.

46.    This action has been brought and may properly be maintained as a class action, pursuant to the provisions of  Rules 23(a), (b)(2), and (b)(3) of the Federal Rules

of Civil Procedure on behalf of all members of the Class including from a retailer in the United States and/or Indirect Purchaser States (defined below), or the Consumer Fraud States (defined below) during the Class Period:

    a.    The Class is so numerous that joinder of all members is impracticable. Due to the nature of the trade and commerce involved, the members of the Class are geographically dispersed throughout the United States and/or the Indirect Purchaser States and/or the Consumer Fraud States. The precise number of Class members is unknown to Plaintiff. The true number of Class members is likely to be known by Defendants, however, and thus, may be notified of the pendency of this action by published notice or other alternative means. Throughout the period of time covered by this Complaint, Defendants and their co-conspirators engaged in the business of marketing and selling Commercial insurance contracts throughout the United States and throughout the Indirect Purchaser States and Consumer Fraud States.

    b.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

    i.    whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain , manipulate or stabilize the prices of, or allocate the market for, sales of insurance through premiums;

    ii.    whether the combination or conspiracy caused insurance premium prices to be higher than they would have been absent the Defendants' conduct.

iii.     the time period of Defendants' combination or conspiracy

iv.     whether the Defendants' alleged conduct caused injury to the business or property of Plaintiff and the members of the Class;

v.     the appropriate  measure of  damages suffered by the Class;

vi.     whether Defendants' conduct violates Section 1 of the Sherman Act (15 USC Section 1), as alleged in Count I;

vii.     Whether the alleged conduct violated the Indirect Purchaser States laws concerning antitrust as alleged in Count II of this Complaint;

viii.     whether Defendants' conduct violates, unfair competition, and consumer protection laws of the other states  as alleged below in Count III;

ix.     Whether Plaintiffs and the Class have a claim for unjust enrichment,

x.     Whether injunctive relief is necessary to stop future violations from occurring;

xi.     Whether contingent commissions created a conflict of interest with clients;

xii.     Whether Defendants concealed or failed to disclose  the nature a amount or extent of contingent commissions to clients in respect to contractual duties;

xiii.     Whether Defendants owed a fiduciary duty to clients, and whether defendants breached those duties;

xiv.     the appropriate nature of class-wide equitable relief.

c.      Plaintiffs' claims are typical of the claims of the other members of the Class it seeks to represent.  Defendants' illegal and inequitable methods, acts, and trade practices have targeted and affected all members of the Class in a similar manner. Furthermore, Plaintiff and all members of the Class sustained monetary injury arising out of Defendants' wrongful conduct.

d.      Plaintiffs will fully and adequately protect the interests of all members of the Class.  Plaintiffs have retained counsel who is experienced in class action and antitrust litigation.  Plaintiffs have no interests which are adverse to or in conflict with other members of the Class.

e.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all class members is impracticable.  The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

f.      The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The damages suffered by the individual class members

may be relatively small; and therefore, the expense and burden of individual litigation make it virtually impossible for them to redress the wrongs done to them. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## NATURE OF TRADE AND FACTUAL ALLEGATIONS

47.    Plaintiff's claims arise from the Defendants' manipulation of the market for Commercial Insurance in the United States, through both U.S. and London insurance markets.

48.    The conspiracy and scheme to defraud involves payment of contingent commissions as payments to certain brokers by Lloyd's of London entities in exchange for the brokers steering clients to certain higher profit accounts that resulted in higher premiums to the clients.

49.    The Defendant Lloyd's of London (hereinafter Lloyd's) has provided the market for the world's largest commercial insurers, including in the United States. Lloyd's has written approximately 40% of the insurance in the United States.

50.    Lloyd's is not an insurance company, but rather, it is a marketplace where members join and interconnect to underwrite insurance risks. The members of the Lloyd's exchange supply the capital to Lloyd's syndicates for the risks that are being insured against. There are currently 66 underwriter syndicates within the Lloyd's exchange market, according to Lloyd's website at www. Lloyds.com.

51.    Policies that represent insurance risks to clients are introduced into Lloyd's market by brokers around the world. The risks are purchased traded and repurchased, as an exchange similar to a security or commodity exchange i.e. NYSE and CBOT.

52.     Lloyd's has several London based brokers (Willis UK, Marsh UK, and AON UK) in addition to these brokers Lloyd's also has US based brokers (Willis, AON, Swett and Crawford, Marsh US) all known together as "brokers".

53.     The Lloyd's syndicate and their managing members, along with other unknown syndicates in the Lloyd's market in the US, had agreements with Lloyd's Brokers to direct and steer business and protect the renewals from any new competition for the Defendants Lloyd's syndicates in exchange for undisclosed bonuses, overrides and kickbacks also known as contingent commissions.

54.     These agreements between Defendants syndicates and brokers had clauses in the contract known as Placement Service Agreements ("PSA") and later contract clauses known as Marketing Service Agreements ("MSA") that provide for payments of bonuses based upon the amount of policy premiums per a time period.

55.     The PSA and MSA state that the brokers shall receive override bonuses from The Lloyd's syndicates in the Lloyd's Market for improperly steering and allocating business of commercial insurance policies to them and securing for the Defendants large volumes of businesses and premiums where the Syndicates do not have to compete with other syndicates or insurers as to policy prices and amount of coverage terms.

56.     The contingent commission payment clauses are named various things including override agreements, compensation for services, supplemental compensation, or the like.

57.     The Defendants of the Lloyd's Syndicate and others within the Lloyd's market have made payments to Lloyd's Brokers that include Marsh, AON, and Willis pursuant to the PSA and MSA in the agreements between the Defendants.

58.     These MSA and PSA type agreements were put in place to facilitate the steering of clients to certain policies and companies through fake quotes and misleading information.

59.     The brokers state to their client through various press releases and literature provided to the client that they will provide advice that is unbiased, and that they will assist the client in selecting the company and policy that is the best fit for the client. This is accomplished by the brokers offering "independent advice" on coverage, premiums, and risk assessment.

60.     In this regard, the brokers' act as an independent fiduciary to the client and create a fiduciary relationship between the broker and the client.

61.     In reality, the Lloyd's brokers are not searching for the best deal for the client. They are making recommendations based upon what is best financially for the broker. This conduct has impacted Plaintiffs by not allowing the competitive market to act as it should, and the Plaintiff is forced into paying supra-competitive prices for commercial insurance.

62.     The defendants as a group have acted together to eliminate competition.  The concealing of these bonus payments to the brokers created inflated market share and profits for the Defendants.

63.     The payment of contingent commissions for steering clients to certain brokers is not new; many states insurance departments and State Attorney Generals have investigated and fined a multitude of insurance brokers. The aftermath of these investigations is that approximately 25 individuals have pled guilty or have been indicted for this scheme.

64.     The United States regulators have entered into settlements with the U.S. based brokers (Marsh, Aon, Willis, ACE, St. Paul Travelers, and several others).

65.     Lloyd's of London Syndicate acknowledges the conflict of interest created by these PSA and MSA agreements. Additionally, Lloyd's Syndicates to this day provide inadequate disclosures of said contingent commissions in both the UK and US.

66.     Lloyd's in 2006 had approximately $1.25 Billion in premiums paid in the United States alone. Lloyd's is a major participant in the surplus line insurance provider market in the US.

67.     Lloyd's underwriters do not directly deal with policy holders, but instead, the brokers and agent deal directly with the clients.

68.     Lloyd's has offices in New York, Chicago, Los Angeles, Kentucky, and US Virgin Islands. Lloyd's underwriters are accredited in all states including Washington D.C., USVA, and Puerto Rico.

69.     The commercial insurance market covers a multitude of risks that a company needs to be successful. For example, there is professional liability, casualty, property, workers compensation, mortgage guarantee, property liability, and reinsurance that a client can purchase based upon the type of business and the direct needs of that business.

70.     The Defendant brokers garner a majority share of the commercial insurance brokering accounting for well over 50% of the accounted premiums.

71.     The payment of contingent commissions helped to keep Lloyd's market share and policy premiums higher that would normally be associated with it if normal market conditions had prevailed.

## **DEFENDANTS' ILLEGAL CONDUCT**

72.     The market for commercial insurance is complex and global. In response to this, businesses have gone to use a system of insurance brokers for expert help in

researching and choosing the best possible insurance coverage for the most competitive price.

73.    Insurance brokers are an intermediary between the client and the underwriter. Brokers assess risk and compare different types and amounts of insurance. Businesses trust the opinions of the brokers, and therefore, the businesses trust that they are getting real unbiased information based upon their specific needs and not what is best for the broker's bottom line.

74.    All commercial insurance brokers purport to be independent and objective according to their own literature and press releases.  They all state their main goal is client satisfaction and keeping the client's best interests in mind.

75.    Lloyd's used the contingent commissions to keep market share and to raise premiums prices without the knowledge of the policy holders. Lloyd's receives a flat fee standard commission from either the policy holders or the syndicates. Lloyd's has also entered into contingent commission agreements for payments based on insurance volumes.

76.    In these contingent commission agreements, Lloyd's syndicates pay to Lloyd's brokers in the UK and US, but undisclosed to the clients, a bonus based on the volume of insurance premiums generated, the growth of policy premiums through existing policies, favorable profit/loss ratios, and the profitability of the policies sold to clients.

77.    In return for these payments the broker Defendants promise to steer a certain volume of insurance premiums from particular lines. Commercial insurance clients of the brokers in the United States were only aware of the standard commission

paid and not aware of the contingent commissions paid to the UK-based brokers or US-based brokers. This is commonly known as a term referred to as "double dipping".

78.     These agreements that were in place between the Defendants helped Lloyd's of London and Lloyd's syndicate maintain, enforce, and collect sums through anti-competitive practices such as client steering to certain high profit policies, bogus quotes to keep incumbent brokers the lowest bid, and maintenance of higher than normal market share and profit margins on policies.

79.     All of this was done to the detriment of the client for which the Defendants pledged independent and unbiased advice.

80.     In regards to client steering the brokers would set clients up to purchase a policy by which the broker would get the best commission rate if the broker sent the client to a "preferred" type and the amount of the policy through a "preferred" underwriter. This is contrary to every item of literature that the Defendants purport to comply with.

81.     The broker should not be swayed by how much commission he/she will get for the sale of the policy, but should according to the defendants' own literature have a fiduciary duty to get the client the best possible coverage for the best possible price regardless of the commission the broker will receive. This does not occur in reality.

82.     The PSA and MSA created a conflict incentive that would have the Lloyd's brokers place more volume with Lloyd's Syndicate than it would in a competitive market, place more renewal volume with Lloyd's Syndicate than it would in a competitive market, minimize or extinguish competitive bidding, and not lower premiums or deductibles as would occur in a competitive market.

## DEFENDANTS DID NOT DISCLOSE THE EXISTANCE OF CONTINGENT COMMISSION TO THEIR CLIENTS

83.     Defendants failed to adequately disclose the agreements between the Defendants for contingent commissions to the clients that are in the Plaintiffs' class.

84.     The Defendants' agreements were confidential and unknown to clients and the public at large and were enforced by confidentiality agreements within the contingent commission agreements.

85.     The Defendant brokers did not disclose any information regarding these contingent commissions and/or contingent commission agreements and had corporate policies to prohibit the dissemination of this information.

## DEFENDANTS PROCURRED BOGUS AND FALSE BID QUOTES FROM CO CONSPIRATORS AND TRADE ASSOCIATIONS INVOLVEMENT

86.     Defendants' scheme to rig bids for commercial insurance quotes was done to protect the incumbent company and to thwart competition among companies. The Defendants would request non-competitive bids from another company to "show" that the incumbent quote was the best price.  In reality the two quotes were both over a competitive market driven quote for a policy.

87.     State and regulatory agencies investigating this practice lead to 18 former broker employees pleading guilty to criminal charges for their participation in the bid rigging scheme.

88.     The trade industry group known as Council of Insurance Agents and Brokers (CIAB) had a part in this illegal activities regarding contingent commissions.

89.      Lloyd's is a CIAB gold member along with other Defendants. The CIAB membership sells approximately 80% of all insurance policies in the United States.

90.     The CIAB provided the Defendants with the means and opportunity to conspire and hatch this illegal scheme to increase profits beyond what a legal competitive market could obtain.

91.     Another trade association is the Council of Insurance Company Executives (CICE) made up of 6 commercial insurers. As a unit the CICE members comprise approximately 80% of the commercial insurance policy premiums sold in the United States.

92.     The CIBA and CICE both opposed new regulation regarding disclosures of contingent commission agreements.

## **FRAUDULENT CONCEALMENT**

93.     The running of any Statute of Limitations has been suspended with respect to any claims which the Plaintiffs and other members of the Class have sustained as a result of the unlawful combination and conspiracy alleged herein and with respect to their rights to injunctive relief by virtue of the federal doctrine of fraudulent concealment. Defendants through various devices and techniques of secrecy affirmatively and fraudulently concealed the existence of the unlawful combination and conspiracy alleged herein.

94.     As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statues of limitations otherwise applicable to the allegations herein have been tolled.

## COUNT I

## VIOLATION OF SECTION 1 OF THE SHERMAN ANTITRUST ACT AND SECTION 4 OF THE CLAYTON ACT

95.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

96.     Defendants and the un-named conspirators entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of the Section 1 of the Sherman Act and Section 4 of the Clayton Act.

97.     The contract, combination, or conspiracy alleged herein has resulted in an agreement or concerted action among the Defendants and their un-named conspirators whereby as a result of these actions insurance premiums and prices charged for insurance services were fixed, maintained, and standardized.  The alleged contract, combination, or conspiracy is a per se violation of federal antitrust laws and is at a minimum an unreasonable and unlawful restraint of trade.

98.     As result of defendants' unlawful conduct, plaintiff has suffered damage by paying supra-competitive prices that they would not have had to incur but for the unlawful conduct of defendants as alleged herein.

99.     The Plaintiffs request that Declaratory and injunctive relief be granted to them to eliminate the problem of this price fixing and bid rigging scheme. If injunctive and declaratory relief are not granted, the Plaintiffs fear that this illegal scheme will continue and damage the Plaintiffs further.

100.    A monetary relief shall only compensate the past wrong and will do nothing to stop the on going and forward progress of this illegal scheme to fix prices in commercial insurance policies.

## COUNT II

## Violation of State Antitrust Statutes

101.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

102.    Defendant's intentional and purposeful anti-competitive acts that are described above including but not limited to acts of collusion to set prices and the actual act of price fixing itself was intended to and did cause Plaintiffs to pay supra-competitive prices for insurance policy premiums and for insurance services in the Indirect Purchaser States.

103.     Defendants' monopolistic and anticompetitive acts as described above are in violation of the following state antitrust statutes:

104.    Defendants have violated Arizona Revised Statutes § 44-1403.

105.    Defendants have violated California Business & Professions Code § 16700, *et. seq.*

106.    Defendants have violated District of Columbia Code § 28-4503.

107.    Defendants have violated Florida Statutes § 542.19.

108.    Defendants have violated Iowa Code § 553.5.

109.    Defendants have violated Kansas Statutes § 50-101.

110.    Defendants have violated Maine Revised Statutes, Title 10 § 1102.

111.    Defendants have violated Michigan Compiled Laws § 445.773.

112.    Defendants have violated Minnesota Statutes § 325D.52.

113.    Defendants have violated Mississippi Code § 75-21-1, *et seq.*

114.    Defendants have violated Nevada Revised Statutes § 598A.060.

115.    Defendants have violated New Jersey Statutes § 56:9-4.

116.    Defendants have violated New Mexico Statutes § 57-1-2.

117.    Defendants have violated New York General Business Law § 340, *et. seq.*

118.    Defendants have violated North Carolina General Statutes § 75-2.1.

119.    Defendants have violated North Dakota Century Code § 51-08.1-03.

120.    Defendants have violated South Dakota Codified Laws § 37-1-3.2.

121.    Defendants have violated Tennessee Code § 47-25-101, *et. seq.*

122.    Defendants have violated Vermont Statutes, Title 9, § 2453.

123.    Defendants have violated West Virginia Code § 47-18-4.

124.    Defendants have violated Wisconsin Statutes § 133.03.

125.    Plaintiffs and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial. Plaintiffs and the Class seek treble damages pursuant to the Indirect Purchaser States antitrust laws as stated above where they are allowed by law.

126.    Defendants' willful and unlawful conduct allow Plaintiffs and the Class to seek attorneys' fees in the Indirect Purchaser States where they allowed by law. Plaintiffs and the Class seek attorneys' fees where they are allowed by law.

## COUNT III

### Violation of State Consumer Protection Statutes

127.     Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

128.     The deceptive practices of the Defendants as alleged above included but are not limited to collusion between Defendants in setting prices and actual price fixing with the intended purpose to maintain supra-competitive pricing for insurance policy premiums and for insurance services (all unknown to the general consumer public). Defendants' deceptive and anti-competitive conduct resulted in higher consumer prices for insurance policy premiums and for insurance services because of supra-competitive pricing by Defendants.

129.     Defendants' acts as described above are in violation of the following state Consumer Protection statutes:

130.     Defendants have violated Alaska Statutes § 45.50.471, *et seq.*

131.     Defendants have violated Arkansas Code § 4-88-101, *et seq.*

132.     Defendants have violated California Business & Professions Code § 17200, *et. seq.*

133.     Defendants have violated District of Columbia Code § 28-3901.

134.     Defendants have violated Florida Statutes § 501.201.

135.     Defendants have violated Idaho Code § 48-601.

136.     Defendants have violated Maine Revised Statutes, Title 5 § 207, *et seq.*

137.     Defendants have violated Montana Code § 30-14-101, *et seq.*

138.     Defendants have violated Nebraska Revised Statutes § 59-1601, *et seq.*

139.    Defendants have violated Nevada Revised Statutes § 598.0903, *et seq.*

140.    Defendants have violated New York General Business Law § 349, *et. seq.*

141.    Defendants have violated New Hampshire Revised Statutes § 358-A:1, *et seq.*

142.    Defendants have violated New Mexico Statutes § 57-12-1, *et. seq.*

143.    Defendants have violated North Carolina General Statutes § 75-1.1, *et. seq*

144.    Defendants have violated Utah Code § 13-11-1, *et. seq.*

145.    Defendants have violated Vermont Statutes, Title 9, § 2451, *et. seq.*

146.    Defendants have violated West Virginia Code § 46A-6-101, *et seq*.

147.    Plaintiffs and the Class seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

148.    Defendants' willful and unlawful conduct allow Plaintiffs and the Class to seek attorneys' fees in the Consumer Fraud States where they allowed by law.  Therefore, Plaintiffs and the Class seek attorneys' fees where they are allowed by law.

## **COUNT IV**

### **Unjust Enrichment**

149.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

150.    Defendants benefited greatly from overpayments caused directly from their unlawful and anti-competitive acts as described above for supra-competitive prices for insurance policy premiums and for insurance services.  It would be inequitable for Defendants to retain the benefit of these overpayments that were conferred by Plaintiffs and the Class.

151.    Plaintiffs and the Class are entitled to return of these overpayments caused by the willful acts of the Defendants either as damages or restitution.

## COUNT V

## Common Law Restraint of Trade for Class Members For State of New York only

152.    Plaintiffs re-allege and incorporate by reference all of the allegations of this Complaint with the same force and affect as if fully restated herein.

153.    Defendants have a vast majority of worldwide and New York market share of insurance policy and insurance services.

154.    Defendants have maintained its monopoly in the State of New York over the insurance policy and insurance services market through a series of purposeful and intentional acts since at least January 1, 1998.

155.    These intentional acts included but are not limited to artificially fixing, raising, maintaining, and stabilizing the prices paid by insurance policy and insurance services and the prices paid by insurance policy and insurance services resellers.

156.    The intentional and unlawful acts of Defendants were designed to and actually caused Defendants to artificially fix, raise, maintain, and stabilize prices of insurance policy and insurance services within the State of New York.

157.    As proximately and directly caused by Defendants' intentional and unlawful acts to restrain trade in the insurance policy and insurance services markets, Plaintiffs had to pay supra-competitive prices for insurance policy and insurance services it purchased from Agents.

158.    Plaintiffs and the Class seek actual damages in an amount to be determined at trial for injuries suffered as a result of the allegations stated herein.

## DEMAND FOR JURY

Pursuant to Federal Rule of Civil Procedure 38(b) and otherwise, Plaintiff respectfully demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class request as follows:

(a)     that this Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)     that this Court declare, adjudge, and decree that Defendants have committed violations of the Sherman Antitrust Act and the Clayton Act as alleged herein;

(c)     that this Court declare, adjudge, and decree that Defendants have committed violations of state antitrust and consumer protection laws alleged herein;

(d)     that this Court declare, adjudge, and decree that Defendants have committed violations of New York common law restraint of trade alleged herein;

(e)     that this Court award Plaintiffs and the Class their actual damages for Defendants' restraint of trade or commerce pursuant to New York common law, in an amount to be determined at trial;

(f)     that this Court award Plaintiffs and the Class treble damages for Defendants' violation of Indirect Purchaser States' antitrust laws in an amount to be determined at trial where they are allowed by law and actual damages where treble damages are not allowed by law;

(g)    that this Court award Plaintiffs and the Class their actual damages for Defendants' violation of Consumer Protection Statutes, in an amount to be determined at trial;

(h)    that this Court grant Plaintiffs and the Class the actual costs in prosecuting this action, together with interest and reasonable attorney's fees and costs;

(i)    that this Court award Plaintiffs and the Class the return of overpayments made by them for Defendants' insurance policy and insurance services;

(j)    that this Court grant such further and other relief as this Court deems just and proper.


DATED: New York, New York
          July 25, 2007

                                        LOVELL STEWART HALEBIAN LLP

                                        By:_____
                                        Christopher Lovell (CL-2595)
                                        Craig M. Essenmacher
                                        Keith Essenmacher
                                        500 Fifth Avenue, 58th Floor
                                        New York, New York 10110
                                        Phone: (212) 608-1900

30